# CASES

IN THE

# SUPREME COURT OF ALABAMA

## NOVEMBER TERM, 1901.

## Mann v. The State.

### Indictment for Murder.

1. *Organization of jury; right of solicitor to examine juryman on voir dire.*—Where, in the organization of a petit jury for the trial of a capital case, one of the persons whose name is drawn, upon his examination *voir dire*, answers that he would convict on circumstantial evidence if the evidence proved the crime beyond a doubt, it is competent for the State to further ask said juryman: "Suppose the evidence was such that, while it left some doubt in your mind, still your mind was satisfied beyond a reasonable doubt, would you convict then?"

2. *Trial and its incidents; right of solicitor for the State to make a statement upon the opening of the case as to what he expects the evidence to show.*—It is competent for the solicitor upon the opening of a criminal case, to make a preliminary statement as to what the State expects the evidence to show, and in this way state to the jury the case as he proposes and expects to present it to them on the evidence.

3. *Trial and its incidents; objection addressed to discretion of court.*—On the redirect examination of a witness, the fact as to whether or not a question propounded to him is in rebuttal, is addressed to the sound discretion of the trial court, and will not be reviewed on appeal.

4. *Same; same.*—As to whether or not a solicitor for the State should be permitted to lead a witness in his examination, is a matter addressed to the discretion of the court; and it is not error for the court, upon being requested by the solicitor for permission to lead a witness, to reply in the presence of the jury that he would permit the witness to be led, inasmuch as he thinks "he is an unwilling witness."

[Mann v. The State.]

5. *Evidence; right to refresh memory .of witness.*—It is not error for the court to permit a witness to be asked whether he did not testify to certain facts on the preliminary trial of the defendant, when such question is asked solely for the purpose of refreshing the witness's memory.

6. *Same; when not error to refuse to allow certain questions to be answered.*—Where it appears, in the trial of a criminal case, that a witness for the defendant had testified to every fact within his knowledge having any pertinent and legal bearing on the case, it is of no consequence that the court did not allow him to answer questions as to how certain conversations between him and the deceased arose.

7. *Pleading and practice; no adverse inference to be drawn from failure to introduce witness.*—The failure of a party to introduce a witness affords no ground for argument or inference unfavorable to such party, and the fact that a witness has been subpoenaed by that party and is in attendance is immaterial; and, therefore, it is not competent for the derendant in a criminal case, on the examination of a witness introduced by him, to show that said witness was subpoenaed by him.

8. *Homicide; question properly refused which assumes facts not shown to exist.*—On a trial under an indictment for murder, where the evidence tended to show that immediately upon the defendant aemanding an apology from the deceased, he fired upon the deceased, it is not competent for the defendant to ask one of his witnesses how many minutes elapsed between the demanding of the apology and the firing upon the deceased by the defendant; such question assuming that some minutes elapsed.

9. *Homicide; admissibility of evidence as to physical condition of defendant and deceased.*—On a trial under an indictment for murder, where there was evidence introduced going to show that the deceased was a strong, robust man physically, and that the defendant was weak and delicate, further inquiry as to how it came to pass that the defendant was not robust and strenuous is immaterial and is properly refused.

10. *Same; admissibility of evidence.*—On a trial under an indictment for murder, the length of time the defendant had lived in the city when the homicide was committed, the length of time he had known the deceased, and the place of his marriage were irrelevant and impertinent facts, and questions calling for such facts are properly disallowed.

11. *Same; same.*—On a trial under an indictment for murder, it is competent for the State to ask the defendant, upon cross ex-

[Mann v. The State.]

amination as a witness, if he did not get the pistol for the purpose of making the deceased apologize for an insult which he had offered the defendant.

12. *Same; same.*—On a trial under an indictment for murder, it is not competent for the defendant to testify as to whether in his opinion there was a reasonable method of escape without exposing himself to great danger, or as to whether he had retreated as far as he could without exposing himself to great danger; such questions being for the jury to determine upon all the facts introduced.

13. *Same; same.*—On a trial under an indictment for murder questions calling for the conclusions of the defendant, who was being examined as a witness, are properly disallowed.

14. *Same; same.*—On a trial under an indictment for murder, where the evidence tended to show that the defendant demanded an apology from the deceased and immediately shot him, it is competent for the State to prove by the judge before whom there was a preliminary trial of the defendant, what the defendant said on the preliminary trial was his desire and intention when he demanded the apology from the deceased; such statement on the part of the defendant tending to show malice, premeditation and formed design on his part.

15. *Evidence; competency of map or diagram.*—On a trial in a criminal case, where the defendant has, during his examination, made a diagram of his office which he used during his examination, it is competent for the State to introduce such diagram in evidence.

16. *Homicide; charge of court to jury.*—Charges to the jury upon self defense, which fail to instruct the jury as to the constituents of self defense, are erroneous and properly refused.

17. *Same; same.*—On a trial under an indictment for murder, charges as to self defense which pretermit all reference to the duty of retreat are erroneous and properly refused.

18. *Same; same.*—In a criminal case, a charge is erroneous and properly refused, which instructs the jury that "unless the jury are so convinced by the evidence of the defendant's guilt that they would each venture to act upon that decision in matters of the highest concern and importance to his own interest, they must acquit him."

19. *Same; same.*—On a trial under an indictment for murder, a charge to the jury which authorizes the acquittal of the defendant upon a reasonable doubt engendered by the testimony of the defendant alone, is erroneous and properly refused; since such doubt may be entirely allayed and removed by the other evidence in the case.

[Mann v. The State.]

20. *Charge of court to jury; sufficiency of evidence.*—In a criminal case, charges are erroneous and properly refused which instruct the jury that "if after weighing all the evidence you can not say beyond a reasonable doubt which is the heavier, that for the State or that for the defendant, then it is your duty to acquit the defendant;" and "if the evidence for the State shows that the defendant is guilty, but the evidence for the defendant shows equally that he is not guilty, and you so find, this would leave your mind in equipoise, and it would be your duty to acquit the defendant."

APPEAL from the City Court of Mobile.

Tried before the Hon. O. J. SEMMES.

The appellant, Charles B. Mann, was indicted and tried for the murder of David Dickson, was convicted of murder in the second degree, and sentenced to fifteen years in the penitentiary.

During the organization of the petit jury for the trial of the case, George Stewart was drawn as a juror, and in answer to the question propounded to him by the court answered that he would convict on circumstantial evidence "if the evidence proved the crime beyond a doubt." Thereupon the solicitor asked said Stewart the following question : "Suppose the evidence was such that while it left some doubt in your mind, still your mind was satisfied beyond a reasonable doubt, would you convict then?" The defendant objected to the solicitor asking this question, the court overruled the objection, and the defendant duly excepted. The said Stewart answered that the evidence could be strong enough for conviction. Thereupon the State challenged said Stewart peremptorily.

The bill of exceptions contains the following recitals as to the opening statement of counsel : "During the course of the opening statement of counsel, the defendant's counsel having stated what he expected the evidence would show as to the reasons which actuated the defendant at the time of the homicide, the solicitor in reply stated 'The State expects the evidence to show that when the defendant was asked on *habeas corpus* trial as to what he had reference to when he told the deceased "you must get down on your knees and apologize," he tes-

tified that he had reference to the deceased coming to his office and assaulting him with a knife, had reference to his calling him a son of a bitch in the presence of a negro, and had reference to his drawing a pistol on him that evening.' The defendant moved to rule out the statement upon the ground that the defendant has not testified and it is not known that he will testify, because the statement, if made, is not in the nature of a confession. The court denied the motion, and the defendant excepted, the court stating that he would tell the jury that they should pay no attention to the statements of counsel."

On the trial of the case it was shown that David Dickson was mortally wounded at Monroe Park, a pleasure resort near the city of Mobile, in Mobile county, on Sunday evening, June 16, 1901.

The evidence for the State tended to show that said David Dickson was sitting in a pavilion with some friends when the defendant entered the pavilion and took a seat at a table some distance from the one occupied by Dickson; that between the table occupied by the defendant and the one where the deceased was sitting, there was a table at which some actresses were sitting; that shortly after the defendant came in, he called to one Tuttle and asked him to come over to his table; that just as the defendant called, a waiter returned some change to the actresses and Dickson remarked, "Lend me a dollar;" that thereupon the defendant rose from his table and asked: "Who made that crack?" or "Who made that statement?" at the same time pulling his pistol from his hip pocket; that after the defendant rose with pistol in hand the said Dickson got up from the table where he was sitting and drew his pistol; just after the defendant drew his pistol, one Peter Burke, Jr., who was near him, knocked the pistol out of his hand: that as the said Dickson advanced upon the defendant the latter pulled his coat open and said "Shoot me, you cowardly cur; you haven't the nerve to shoot;" that thereupon one Hill rushed up to Dickson and took his pistol away from him and tried to keep the defendant and the said Dickson from getting together; that as Dickson advanced towards the defendant, the defend-

ant backed off to where the pistol had been knocked from his hand, and picked up the pistol; that thereupon the defendant levelled the pistol upon Dickson and said to him: "You must get down on your knees and apologize to me;" that Hill then said to the defendant: "Don't shoot, the man is unarmed, and has no pistol;" that Dickson refused to apologize and the defendant immediately shot him; that as soon as the first shot was fired, Dickson rushed upon the defendant and grappled him and immediately two or three shots were fired by the defendant; that Dickson fell upon the defendant and held him with arms outstretched until some one came and parted them; that Dickson received two wounds in the difficulty, from the effects of one of which he died on June 19, 1901.

There was evidence introduced showing that there was ill feeling between the defendant and the deceased which had existed for some time.

The defendant, as a witness in his own behalf, testified that when he called his friend Tuttle to come over to his table, he heard the remark made by some one at the table near by, "Lend me a dollar," which he considered an insult as being a sarcastic way of accounting for his calling Tuttle to his table, it being his purpose to borrow money from him; and thereupon he rose from the table and asked the question as to "Who made that crack?" or "Who made that statement?" that at that time he did not know that the deceased was in the pavilion, but that as soon as he rose from the table, the deceased rose also with his pistol in his hand; that after his, the defendant's, pistol was knocked out of his hand, he threw up his hands and said to the deceased that he was not armed, and, calling him a cowardly cur, told him to shoot; that he did not see Hill or any one else take the pistol from the deceased, nor did he know that the pistol had been taken from him; that he, the defendant, retreated and when he got to the place where the pistol was lying, he picked it up for the purpose of defending himself against the deceased; that Hill was trying to prevent the deceased from getting to him, and that as the deceased passed by Hill going towards him,

[Mann v. The State.]

and when he was within five or six feet of the defendant, the defendant fired upon him, believing that the deceased had a pistol; that the deceased then rushed upon him and in the struggle the defendant fired two or three times.

The defendant also testified that several days before the killing the deceased came to his office in the Custom House in company with one Clayton; that upon going to his office the deceased asked the defendant to come out into the hallway, whereupon the defendant asked him to come in, saying he was alone; that thereupon the said Dickson came into the defendant's office and said to him that he understood that he, the defendant, had stated that Dickson's wife was not a fit person for his, the defendant's, wife to associate with; that the defendant denied making such statement, and immediately Dickson commenced to curse the defendant and called him the vilest and most opprobious epithet, and threatened to cut his throat. The defendant also testified that on the next day, after the occurrence, or the second day thereafter, the said Dickson again came to the Custom House inquiring for the defendant, and said to the elevator man to tell the defendant that the defendant was a s— of a b—, and that when he came home he, Dickson, would shoot his d— head off.

There was also evidence introduced showing that David Dickson, the deceased, weighed about 160 to 180 pounds, was about 5 feet 10 inches tall, was a strongly built man, and that the defendant was a delicate man, about 5 feet 10½ inches tall, and weighed about 130 pounds.

There was also evidence introduced tending to show that the defendant had married Dickson's sister; and that Dickson objected to such marriage, and had made a violent protest against it.

The defendant, as a witness in his own behalf, testified that the only objection Dickson had to defendant's marrying his sister was that he had not obtained the consent of his sister's mother, and that the defendant obtained the consent of the mother and was married to Dickson's sister at his house.

Dr. Harry T. Inge was examined as an expert, and, after testifying that on the 16th day of June, 1901, David Dickson was brought to his sanitorium suffering from pistol shot wounds, and that he died on June 19, 1901, then testified to the dying declaration which was made by Dickson after he had been told by the doctor that he was going to die. The doctor further testified that the dying declaration was taken down by a nurse at the sanitorium as it was made by Dickson. In testifying as to what the declaration was, he stated on cross-examination that his recollection was that Dickson said that "as soon as Mann saw him that Mann started towards him with a pistol and he said he drew his pistol about the same time." Upon re-direct examination, the solicitor asked Dr. Inge "to refer to the typewritten statement of his evidence on the preliminary trial for the purpose of refreshing his recollection, and then to state whether or not the typewritten staement contained word for word the memoranda that the nurse took down as made by Dickson, and whether or not he remembered what Dickson did say as to whether or not Mann had his pistol out before he drew him." The defendant objected to this question, because it was not in rebuttal. The court overruled the objection, and the defendant duly excepted. The witness answered that he would stare that Dickson said as soon as Mann saw him, Mann started towards him, drawing his pistol.

During the examination of one John Hyde as a witness, he testified that he never heard the defendant make any threat against the deceased within two or three months prior to the difficulty. Thereupon the solicitor asked the witness: "Did he, the defendant, ever talk with you about Dickson?" The defendant objected to this question, because it called for incompetent, irrelevant and immaterial evidence. The court overruled the objection, and the defendant duly excepted. The witness answered: "Yes; he has spoken to me about Dickson." The solicitor then asked the witness the following question: "Did he ever say anything to you relative to the fuss they had in the Custom House?" Upon the defendant objecting to this question upon the same ground,

[Mann v. The State.]

the solicitor requested the court to be permitted to lead the witness. In answer to this request the court replied: "I will let you lead him. I think he is an unwilling witness." The defendant reserved an exception to this remark of the court, which was made in the presence of the jury.

One J. J. McAuley was examined as a witness in behalf of the State and testified that he had seen the difficulty between the defendant and the deceased, and also testified to the circumstances of the difficulty. This witness testified that the defendant, after his pistol was knocked out of his hand, said to the deceased: "Shoot, you coward; I don't believe you would shoot me." The solicitor then asked the witness the following question: "For the purpose of refreshing your recollection, I will ask you if, on the preliminary examination, you did not swear in answer to the question of Mr. Robinson, that he said, 'Shoot, you God damn coward, I don't believe you would shoot?'" The defendant objected to this question, because it called for irrelevant, illegal and incompetent evidence. Thereupon the court instructed the witness that he must not testify as to whether he swore to that fact upon the former trial, but if after refreshing his memory he could now remember it as a fact, he could answer. The defendant excepted to this ruling of the court.

Upon the examination of George Wolfe as a witness for the State, he testified that he knew the deceased in his life time, and the defendant Mann; that about eight days before the shooting at Monroe Park, he had a conversation with Dickson in reference to the deefndant Mann, while Dickson was eating lunch. The defendant then asked the witness the following separate questions: "Just tell the jury how this conversation came up." "Mr. Wolfe, state to the jury what introduced this conversation; how it was started and all about it." "Who started that conversation?" To each of these several questions the State separately objected, upon the ground that it called for irrelevant and immaterial evidence. The court sustained each of such objections, and to each of these rulings the defendant separately excepted. The witness then testified that Dickson told him about

[Mann v. The State.]

his going to the Custom House and calling Mann to account for what he had stated about Dickson's wife.

Upon the examination of George P. Tuttle as a witness for the defendant, he was asked the following questions: "Were you summoned as a witness for the State or for the defendant?" "Were you summoned here in behalf of the defendant or by some one else?" The State objected to each of these questions, the court sustained each of such objections, and to each of these rulings the defendant separately excepted. The witness Tuttle testified to the circumstances of the difficulty between the defendant and the deceased at Monroe Park, and stated that after Mann recovered his pistol, he demanded an apology. Thereupon counsel for the defendant asked the witness the following question: "How long a time elapsed between demanding an apology and the firing of the first shot; how many minutes?" The State objected to this question upon the ground that it assumed some minutes elapsed. The court sustained the objection, and the defendant duly excepted. Counsel then asked: "How long was it?" and the witness answered "a minute or two," he thought.

Upon the examination of Charles B. Mann, the defendant, a witness in his own behalf, he testified that he was 23 years old on the 29th day of June, 1901; that he was 5 feet 10½ inches tall, and weighed about 130 pounds. The defendant, as a witness, was asked the following questions: "Was your work of a severe nature, or was it clerical work?" "Mr. Mann, I will ask you if you did any out door work, or was your work entirely indoors?" "I will ask you if your work was of such a character as to harden your physical condition or otherwise?" "Did you take any outdoor exercise of any character beyond the ordinary walking to and fro incident to your business?" The State objected to each of these questions upon the ground that they called for irrelevant, immaterial and illegal evidence. The court sustained each of these objections, and to each of these rulings the defendant separately excepted. Counsel for the defendant then asked the defendant the following questions: "How long had you lived in Mobile at

the time of the killing?" "Where did you live before
you came to Mobile?" "How long after you came to
Mobile was it that you met Mr. Dickson?" "At what
place in Mobile were you married?" The State objected
to each of these questions upon the ground that it
called for illegal and irrelevant evidence, the court sus-
tained each of the objections, and the defendant sepa-
rately excepted to each of such rulings. The defendant
testified that during the few months he lived in Mobile
that he heard a great many remarks derogatory of his
character. Thereupon counsel for defendant asked him
the following questions: "In consequence of that, did
you say anything to your wife about going with Dick-
son and his wife, or staying away from them, or any-
thing of that character?" "Did you or not, on that ac-
count, raise any objection to your wife going with Dick-
son and his wife?" The State objected to each of these
questions, the court sustained the objections, and the
defendant duly excepted. The defendant then testified
that he did undertake to prevent his wife from going
with Dickson and his wife, and then testified to the diffi-
culty between Dickson and him in the defendant's office
at the Custom House. After the defendant had testified
that when he called upon his friend Tuttle and asked
him to come over to his table, that the remark, "Lend me
a dollar," was then made, and it seemed to him that
it was in a sarcastic tone, clearly insinuating that he
called Tuttle to borrow a dollar from him, and that he
then got up and asked "Who made that remark?" The
solicitor then asked the defendant the following ques-
tion: "This party merely said 'lend me a dollar' and
why should you have thought that this remark was in-
tended for you?" The defendant objected to this ques-
tion upon the ground that it called for irrelevant, imma-
terial and incompetent evidence, and for the uncommuni-
cated thoughts of the witness. The court overruled the
objection, and the defendant duly objected. The witness
answered that the remark was made after the second re-
quest for Tuttle to come over, and inasmuch as it came
from the direction from where Tuttle was sitting, he
naturally concluded such was the motive. After the
defendant had detailed the circumstances of the shoot-

ing and had stated that Dickson began to shove Hill and advance on the defendant, and that he, the defendant, then retreated and went back to where the pistol was slapped from his hand and picked it up, the solicitor asked the defendant the following question: "Didn't you go over there with the purpose in your mind of getting that pistol and going back and making Dickson apologize?" The defendant objected to this question upon the ground that it called for irrelevant and immaterial evidence, and duly excepted to the court overruling the objection. The witness answered that he went over there to get his pistol to put himself on an equal footing with the deceased, and that he wanted him to apologize. On the re-direct examination of the defendant, as a witness, he was asked by his counsel the following questions: "Was there, or did you see, any reasonable method of escape around that ladies' pavilion without exposing yourself to great danger, taking all of the surrounding circumstances into consideration?" "As a matter of fact was or not there any safe method by which you could retreat without exposing yourself to being shot at by Dickson?" "Could you under the existing facts, believing as you say you did, that he was armed, have escaped without increasing your danger?" "Had you or not at that time exhausted every avenue of escape?" How far altogether had you retreated at that time?" "Did you then think or believe that Dickson was in a position to shoot you unless you had a pistol?" The State objected to each of these questions, the court sustained each of the objections, and to each of these rulings the defendant separately excepted. The counsel for the defendant then asked him the following question: "When you picked up your pistol off the ground and moved around that way, had that difficulty ended, or was it still continuing?" The State objected to this question, the court sustained the objection, and to this ruling the defendant duly excepted. In rebuttal the State, against the objection and exception of the defendant, offered in evidence the diagram of the defendant's office, which was made by the defendant while on the stand.

Hon. W. S. Anderson testified in rebuttal that he heard the case on *habeas corpus,* and that the defendant testified upon that hearing freely and voluntarily, without threats or inducement. The solicitor then asked "What did Mr. Mann say that he meant by that statement when he told Dickson to get down on his knees and apologize?" The defendant objected to this question because no sufficient predicate had been laid therefor, and because it was irrelevant, immaterial, incompetent and illegal, and because it was not in rebuttal. The court overruled the objection, and the defendant excepted. The witness answered: "He wanted him to apologize, he said, he referred to the insults he had given him in his office at the Custom House, to the insulting language he had applied to him to a negro, and to the insults he had given him at Monroe Park, in backing him back with his pistol." The defendant move to exclude this testimony on the ground stated in the objection to the question, the court overruled the motion, and the defendant excepted. The solicitor then asked the witness: "Judge, in reference to the shooting, what did he say, if anything, about how many shots were fired and whether or not they were all fired at Dickson, or whether or not some of them were fired into the air, and if so, his reasons for doing that?" The defendant objected to the question on the ground stated in the last objection. The court overruled the objection, and the defendant excepted. The witness answered: "I don't remember distinctly how many times he said he fired, but I do remember he said as he was going down he fired a shot in the air, or made an effort to empty his pistol so as to keep Dickson from getting it. That he tried to empty his pistol by firing it off." The State thereupon closed the case and counsel proceeded with the argument of the case. During the course of the argument the solicitor said: "Mann has denied that Dickson said at the Custom House that he did not want Mann to marry his sister on account of their short acquaintance and because for his reputation for drinking." The defendant objected to the argument because there was no evidence upon which to base the same; the court said that the question had been asked the witness Mann; that he

had replied in the negative and that the solicitor had the right to make the argument; the defendant excepted to the ruling of the court.

The defendant requested the court to give to the jury the following written charges, and separately excepted to the court's refusal to give each of them as asked: (8.) "The law gives to every one the right to kill in self-defense, in every case where the one who does the killing is not at fault in bringing about the fatal difficulty; and if you find from the evidence in this case that Charles B. Mann was not at fault in bringing about the difficulty with Dickson and further find that he probably believed that it was necessary to shoot Dickson in order to protect his own life, then it is your duty to acquit Charles Mann." (16.) "The place where the killing occurred and the fact that women and children were near by, can not and must not be considered by you at all. All you can consider are the circumstances of the killing just as those circumstances have been related by witnesses, and if the statements of those circumstances have left your minds in confusion and doubt so that you can not say to a moral certainty who provoked the difficulty and whether the defendant shot in self-defense when he killed the deceased, then it is your duty to give the defendant the benefit of your confusion and doubt and acquit him." (17.) "If, after weighing all the evidence you can not say beyond a reasonable doubt which is the heavier for the State or that for the defendant, then it is your duty to acquit the defendant." (18.) "If the evidence for the State shows that the defendant is guilty, but the evidence for the defendant shows equally that he is not guilty, and you so find, this would leave your minds in equipose, and it would be your duty to acquit the defendant." (26.) "The court charges the jury that a probability of the defendant's innocence is a just foundation for a reasonable doubt of his guilt, and, therefore, for his acquittal; and if from all the evidence in this case, they believe the defendant's account of this transaction is the correct one and that his conduct at the shooting measured up to the standard of self-defense which the law requires, it is the duty of

[Mann v. The State.]

the jury to acquit him." (29.) "It is not necessary that there should be actual danger of death or of great bodily harm in order to justify the taking of human life; but if the jury are satisfied from the evidence in the case that the circumstances attending the firing of the fatal shot were such as to impress the defendant with the reasonable belief that at the time of the firing of said shot it was necessary in order to prevent death or great bodily harm to his person, then the jury must acquit the defendant, unless they further believe that the defendant was not free from fault in bringing on the difficulty." (30.) "I charge you that if previous threats of the deceased had been communicated to the defendant, and if those threats in connection with the actual conduct of the deceased at the time of the shooting generated in the mind of defendant a reasonable belief that he was in danger of death or of serious bodily harm, then the defendant had the right to act upon these appearances, providing he was not the aggressor in the difficulty." (33.) "The jury alone are to determine the credibility of witnesses and the weight to which their testimony is entitled. In passing upon the truth or falsity of the witness' testimony the jury may weigh it in the light of human nature and affairs. If after applying the test of reason and probability and considering all the testimony in the case, the jury are of the opinion from the evidence that the defendant acted in self-defense as defined by law, it is the duty of the jury to find him not guilty." (38.) "Unless the jury are so convinced by the evidence of defendant's guilt that they would each venture to act upon that decision in matters of the highest concern and importance to his own interest, they must acquit him." (41.) "The defendant is authorized under the statute to testify in his own behalf and the jury have the right to give full credit to his own statements. If in this case the testimony of the defendant is sufficient to raise a reasonable doubt in the minds of the jury as to whether or not he acted in self-defense as charged upon by the court, it is the duty of the jury to acquit him." (46.) "I charge you that you should not hesitate to acquit the defendant if you find that the evidence for the State is probably no stronger than the evidence for

the defendant." (47.) "I charge you that you should. not hesitate to acquit the defendant if you find that the evidence of the defendant is probably as strong as the evidence for the State." (51.) "The court charges the jury that one is justified in taking the life of another, if, at the time, there reasonably appeared to be present, impending, imperious necessity so to do, provided he is free from fault in bringing on the difficulty." (A.) "If from all the evidence in this case you find that the defendant is not guilty, provided he did not know that Dickson was unarmed, then you must acquit the defendant if you find that Dickson was powerful enough to have done the defendant serious bodily harm with his hands or fists, and that the defendant knew his power." (B.) "I charge you, gentlemen of the jury, if you believe from the evidence in this case that David Dickson was powerful enough to have inflicted serious bodily harm upon the defendant with his hands or fists, and that the defendant knew that fact, and further find that the defendant was free from fault in bringing on the difficulty, and that he was convinced by reasonable circumstances that David Dickson then and there intended to do him serious bodily harm, then you must find the defendant not guilty, even though he may have known that Dickson was not armed."

McALPINE & ROBINSON, for appellant.—The court erred in overruling the objection of the defendant to the question asked the juryman Stewart by the solicitor. The rules which circumscribe the defendant on *voir dire* examination apply equally against the State.—*Bales v. State*, 63 Ala. 38; *Lundy v. State*, 91 Ala. 100; *Hornsby v. State*, 94 Ala. 55.

When a witness has made himself explicitly clear on direct and cross-examination, it is not proper to re-hash the same matter on re-direct.—1 Greenleaf on Ev. (15th ed.), 618 *et seq.;* Roscoe's Crim. Ev. (7th ed.), 141; *Kennedy v. State*, 85 Ala. 326.

The court erred in making the following remark to the solicitor in the presence of the jury referring to the witness Hyde: "I will let you lead him. I think he is

[Mann v. The State.]

an unwilling witness."—21 Ency. Pl. & Pr., 994-5-6; *Griffin v. State,* 90 Ala. 596, 600, 601; *State v. Allen,* 100 Iowa 7; *Garner v. State,* (Fla.) 9 So. Rep. 835; *Newberry v. State* (Fla.) 8 So. Rep. 445.

The court erred in permitting the solicitor to ask the question of the witness McAuley which he stated was asked for the purpose of refreshing the witness' recollection. The law contemplates that the effort to refresh the recollection of a witness shall be made in good faith. *Jones v. State,* 115 Ala. 67.

The court erred in refusing to give the eighth charge requested by the defendant. This charge, taken as a whole, asserts good law, and is no more involved, or abstract, or misleading than would be the charge, "If the jury find from the evidence that the defendant is probably not guilty, they must acquit him,"—which has been held a good charge.—*Keith v. State,* 97 Ala. 32; *Winslow v. State,* 76 Ala. 42; *Goodwin v. State,* 102 Ala. 87; *Whitaker v. State,* 106 Ala. 30.

The other charges which the court refused to give at the request of the deefndant should have been given. *Martin v. State,* 119 Ala. 1; *Gilmore v. State,* 99 Ala. 154; *Winter v. State,* 20 Ala. 42; *Coleman v. State,* 59 Ala. 52; *Elmore v. State,* 92 Ala. 51.

CHAS. G. BROWN, Attorney-General, for the State. The questions to McAuley were permissible.—*White v. State,* 87 Ala. 24; *Griffith v. State,* 90 Ala. 583.

Asking the witness Tuttle if he had been summoned as a witness for the State was an attempt to discount his evidence in those respects wherein it was unfavorable to the defendant, and create an unfavorable inference because the State failed to call him as a witness. This was not proper.—*Nelms v. Steiner,* 113 Ala. 562. Even where the opposite party is called he is thereby made the witness of the party calling him.—29 Am. & Eng. Ency. Law (1st ed.), 817.

It was competent for the State on cross-examination to ask the defendant as to his reasons, motives and intentions.—*Linnehan v. State,* 120 Ala. 293; *Hurst v. State,* 130 Ala. 688; *Bryant v. State,* 116 Ala. 45.

The court did not err in its refusal to give the charges

[Mann v. The State.]

requested by the defendant.—*Gilmore v. State*, 123 Ala.
90; *Evans v. State*, 109 Ala. 13; *Howard's Case*, 110
Ala. 93; *Kilgore v. State*, 124 Ala. 24; *Wilkin's Case*, 98
Ala. 6-7.

McCLELLAN, C. J.—It was within the unrevisable
discretion of the city court to allow the solicitor to in-
terrogate the venireman George Stewart as shown by the
record.

It is difficult to conceive upon what ground an objec-
tion to the opening statement of the solicitor as to what
he expects the evidence will show can be predicated. Is-
sue cannot be taken upon the existence of his expecta-
tions in that regard: It cannot be asserted in any way
that we know of either that he does not expect this or
that testimony to be forthcoming, or that, though he be-
lieves this or that testimony to be in existence, he does
not expect the court will receive it in evidence. He is
not confined to forshadowing testimony which he knows
the court will receive, for he cannot thus forestall or be
required to anticipate the court's judgment, but he may
in this way state to the jury the case as he proposes and
expects to present it to them on the evidence. At most
these preliminary statements, when resorted to in our
practice—and whether resorted to at all or not in any
case is within the election of counsel—are tentative and
intended to give the jury a general grasp of the case
that they may be the better able to understand and ap-
ply the facts as they are developed in the course of the
trial; and they constitute no evidence of the facts nor in
any sense take the place of evidence. That part of the
statement of the solicitor in this case to which objection
was made, moreover, would be unobjectionable even were
it conceded that such statements are open to challenge in
this way. The facts which the solicitor stated he ex-
pected to prove were in rebuttal of the line of defense
set forth in the preliminary statement of defendant's
counsel, and evidence of them was actually and prop-
erly received on the trial. The court committed no error
in declining to "rule out" the solicitor's statement, which

the judge did in terms, but at the same time said that he would instruct the jury to "pay no attention to statements of counsel." It is proper to remark that this declaration was too favorable to defendant. The presiding judge doubtless intended to instruct the jury to pay no attention to the statements as *evidence,* for, of course, it was their duty to be attentive to these statements as statements of counsel going to show what they expected the evidence to be.

There is no merit in the exception reserved on the re-direct examination of the witness Inge. The only objection to the question was that the evidence called for was not in rebuttal. This objection—as also that the question was leading which is urged in argument, but not made at the time—was addressed to the discretion of the trial court.

The witnes Hyde, the trial court thought—and doubtless correctly—was an unwilling witness The judge was well within the range of his discretion, therefore, in allowing the solicitor to lead him; and of course the judge had the right to state the ground upon which he allowed leading questions to be propounded to him, viz., that in his opinion the witness was an unwilling witness. All the questions asked this witness relative to a former trouble between the defendant and the deceased seem to have been necessary to get out of him what the former had said in the nature of threats against the latter.

We are unable to see that the court erred in allowing the solicitor to ask the witness McAuley, solely for the purpose of refreshing the latter's memory, whether he had not testified to certain facts on the preliminary trial of the defendant. This is a recognized and often resorted to mode of refreshing the memory of witnesses.

It is entirely clear from the bill of exceptions that the defense drew from the witness Wolfe every fact within his knowledge having any pertinent and legal bearing on the case; and it is of no consequence that the court did not allow him to answer questions as to how a certain conversation between him and Dickson, the deceased, "came up," "what introduced this conversation." etc., etc.; or to testify that Dickson told him that it was

a mistake about Mann's shooting his, Mann's, wife, etc. etc.

It has been decided several times recently by this court that the failure of a party to introduce a witness affords no ground for any argument or inference unfavorable to such party, and the fact that the witness has been subpoenaed by that party and is in attendance can make no difference in this connection. Hence, it was wholly immaterial in this case whether the witness Tuttle, who was in attendance but who was not introduced by the State, had been subpoenaed for the prosecution or not.

It will suffice to say in approval of the court's action upon the question to the witness Tuttle: "How long a time elapsed between the demanding of an apology and the firing of the first shot—how many minutes?" that it assumes that *minutes* elapsed, when it is probable on the whole evidence that less than one minute elapsed.

There was abundant evidence in the case going to show that Dickson was a strong, powerful man physically and that Mann was weak and delicate and this was not questioned. There was, therefore, neither occasion nor excuse for going into an inquiry as to how it came to pass that Mann was not robust and strenuous, as for instance that he had led a sedentary life, that he had not taken much out-door exercise, and that his work was not such as to harden his muscles, that he had lung trouble, etc., etc.

The length of time Mann had lived in Mobile, the place of his residence before he came to Mobile, the length of time which elapsed after he came to Mobile before he met Dickson and the place of his marriage in Mobile were facts of no pertinency to any issue in the case. The same is true in respect of the proposed testimony of Mann that in consequence of remarks derogatory of his character having come to him, he said something to his wife "about going with Dickson and his wife, or staying away from them, or something of that character," etc., etc.; but all this was brought out in the further examination of the defendant as a witness in his own behalf.

The questions by the solicitor to the defendant as a witness on cross-examination as to why he thought the remark, "Lend me a dollar," was addressed to him, and whether he didn't go for his pistol with the purpose of getting it and coming back and making Dickson apologize, etc., etc., were proper under repeated decisions of this court.

It was not for the defendant to testify to his opinion or conclusion that there was no "reasonable method of escape without exposing himself to great danger, taking all the surrounding circumstances into consideration," that as "matter of fact there was not any safe method by which he could have retreated without exposing himself to being shot at by Dickson," "that under existing facts, believing, as he had said he did believe, that Dickson was armed, he could not have escaped without increasing his danger," and that "if he had turned his back Dickson would have had an opportunity to shoot him." These were issues to be tried by the jury and not for the determination of the defendant for them: It was their province, and not his as a witness, to draw conclusions from the facts in this connection.

The distance that Mann had "retreated" had been testified to several times by him, and there was neither injury nor error in the ruling of the court on the question, "how far altogether had you retreated at that time," asked the defendant on the redirect examination of him as a witness, if indeed the court made any ruling upon it.

The question, "Wwhen you picked up your pistol off the ground and moved around that way, had that difficulty ended or was it still continuing?" called for an opinion or conclusion of the witness, Mann, and was properly disallowed. He immediately after stated the facts in this connection, or what he testified to be the facts.

The testimony of the witness W. S. Anderson to the effect than Mann, the defendant, had testified on his preliminary trial that when he, defendant, just before the shooting, demanded of Dickson that he apologize to him, the apology required was for the "insults Dickson had given him in his office at the Custom House, for the insulting language Dickson had applied to him in speak-

ing to a negro and for the insults Dickson had given him at Monroe Park in backing him with a pistol," tended to show malice, premeditaton and formed design on the part of the defendant, fault in following up the difficulty at Monroe Park and that he shot Dickson, not in self-defense, but in redress of these insults for which Dickson failed to apologize on his demand; and was, therefore, admissible. If it had not been in rebuttal, it would have been none the less within the discretion of the court to receive it; but it was in rebuttal of that tendency of defendant's own testimony to show that in making the demand for an apology he had reference to the insult which Dickson had on that occasion put on him, and not previous ones.

The further testimony of this witness as to what Mann had testified on the preliminary hearing as to his making an effort to empty his pistol in the air to keep Dickson from using the weapon on him went in rebuttal of Mann's testimony on this trial, and the theory of the defense, that he acted all along on the belief that Dickson had a pistol, and to support the theory of the prosecution that at the time of the fatal shot Mann knew that Dickson was unarmed, and for these purposes was competent.

It is not conceivable that the introduction in evidence by the State of the diagram of his office at the Custom House made by the defendant while he was being examined as a witness could hae prejudiced the defendant; and whether it did or not, the diagram was in the nature of an admission freely made by him, and competent evidence on the trial.

The defendant as a witness *had* denied in effect "that Dickson said at the Custom House that he did not want Mann to marry his sister on account of their short acquaintance, and because of his reputation for drinking," and there could be no legal objection to the solicitor stating to the jury the fact of such denial.

To charge a jury that a man has the right to kill in self-defense without instructing them as to the constituents of self-defense is to submit to them a question of law, and such a charge should not be given. This was

[Mann v. The State.]

ruled in *Miller v. State,* 107 Ala. 40, and has been often reaffirmed. Charges 8, 16, 26, 33 and 41 refused to the defendant each had this infirmity.

Charge 8 was bad for the further reason that it would have authorized an acquittal on the ground of self-defense, though the jury might have found that Mann could have retreated without increasing his peril or even in absolute safety; and upon the yet further considera-tion, apart from others, that a *probable belief* that a ne-cessity to kill exists is not sufficient. The actor *must* be-lieve that the danger is imminent and actual to life or member, and the facts must be such as import that such danger is real, that it must be real or it must reasonably appear so.

Charge 16 is bad for the further reasons that its first sentence is an argument; that it is misleading in con-fining the jury to the circumstances of the killing, when there was evidence of a previous difficulty and of ante-cedent threats; that it pretermits the doctrine of re-treat; that it requires an acquittal unless the jury should believe to a moral certainty that the defendant provoked the difficulty, when there was abundant justi-fication for a verdict of guilty whether he prooked the difficulty or not, and perhaps for other reasons.

Charge 26 has at least one infirmity other than that common to it and charges 8, 16, 33 and 41: *The defend-ant was by no means entitled to an acquittal on his own "account of the transaction."*

Charge 29 pretermits all reference to the duty of re-treat where retreat will not increase the peril, as does also charge 30.

Charge 38 is in the language of a charge that was at one time approved by this court, but that decision has been departed from, and charges in this language have re-cently been several times held bad.

Charge 41 was open to the further objection that it authorized an acquittal on a reasonable doubt engen-dered by the testimony of the defendant, when such doubt may have been entirely allayed and removed by the other evidence in the case. Moreover, the charge is in its first proposition a mere argument.

Charges 17 and 18 were properly refused. The jury was under no duty to weigh the evidence for the State and for the defense separately and then the one against the other and find which was "the heavier," nor to consider the evidence for the State separately and finding that it showed the defendant guilty, then to consider the evidence for the defense separately, and finding that it equally showed the defendant not guilty, to acquit him; but their whole duty was to consider all the evidence before them and upon it say whether or not the defendant was guilty beyond a reasonable doubt. The effect of those charges would have been only to inject confusing and improper issues into the case. Charges 46 and 47 are of the same character; and they as well as 17 and 18, when referred to in the evidence, are each bad upon the further consideration that whatever in a sense may have been the heftiness or strength of the evidence "for the defendant" or "of the defendant" and however thoroughly the jury hight have been convinced of its truth, it was yet open to them to find the defendant guilty; his own testimony affording the jury abundant ground to find that he, at one time, retired from the difficulty for the purpose of arming himself and, having accomplished this, voluntarily re-entered upon it.

Charges 51, (A.) and (B.) have many faults, but it will suffice to advert to their pretermission of all reference to the doctrine of retreat.

Affirmed.