206 So.2d 897

Gene WARD

v.

STATE.

6 Div. 99.

Court of Appeals of Alabama.

Dec. 6, 1966.

Rehearing Denied March 28, 1967.

Rogers, Howard, Redden & Mills, Birmingham, for appellant.

Richmond M. Flowers, Atty. Gen., and John C. Tyson, III, Asst. Atty. Gen., for the State.

CATES, Judge.

This appeal was submitted May 5, 1966, on written argument.[1]

In a true bill filed June 5, 1964, the Grand Jury of Jefferson County (Birmingham Division) indicted Ward for the first degree murder of Harry S. Trent.

January 16, 1965, a petty jury, after a trial begun January 11, found Ward guilty of second degree murder and fixed his punishment at the minimum prescribed, ten years in the penitentiary. Ward appeals from judgment entered on the basis of this verdict and from a judgment of October 29, 1965, overruling his motion for new trial.

The transcript of the evidence encompassing 530 pages of 16" x 10½" transcript paper was filed in the circuit clerk's office December 27, 1965, and the record itself, another 64 pages embracing the pleadings and minute entries, was certified February 8, 1966, and came here February 10, 1966.

I.

The Evidence

May 14, 1964, appellant's wife was staying at least some nights with her brother's family, apart from Ward. About 9:30 or 10:00 P.M. Ward went to the apartment where Mrs. Ward stayed. Ward, on being told by Aaron Slayton, the wife's brother, that she was out, said he was going to kill her.

Slayton phoned the police. In a few minutes he heard several shots fired. He again called the police.

Looking out his front door Slayton saw Ward by "a car backed off to the curb over there," standing on the side opposite the driver.

Birmingham police officers, C. W. Hanks and K. S. Zassoda, were patrolling in the Birmingham Southern-Bush Hills section. About 10:45 P.M. they received a call to go to 2102 Tenth Place West, Slayton's address.

As they drove up Ward appeared. He gave Hanks a .45 automatic pistol.

According to Zassoda's testimony the two came to a place where Zassoda saw "a couple of vehicles in front of us." Then:

"Q After the car stopped, did you get out?

"A Yes, sir.

"Q Did Officer Hanks get out?

"A Yes, sir.

"Q Did you get out of the vehicle on the same or opposite side of the automobile?

"A Opposite side.

"Q When you got out, did you see anyone?

"A After I got out of the automobile, I saw an officer coming towards us.

"Q In your judgment, how far was the officer from you when you saw him?

"A Maybe five or ten feet from the car.

"MR. ROGERS: From your car?

"A From the police car, yes, sir.

"Q You later found out the name of this officer?

"A Yes, sir. He identified himself.
"Q And was that person Officer Ward?

1. Appellant postponed his request for oral argument until he filed his reply brief. Uniform practice under Supreme Court Rule 4 requires such a request on the first brief filed.

"A Yes, sir.

"Q Now, did Officer Ward—which side of the car you were in did he approach?

"A He approached the driver's side. I was on the right side.

"Q What did you do as he approached the driver's side?

"A I got out and walked towards the front of the car, and he identified himself to us.

"Q Was he standing in front of the car when he identified himself?

"A Yes, sir.

"Q Where was Officer Hanks at that time?

"A Standing by his door.

"Q Did you have a conversation with Mr. Ward there at that time and place?

"A Officer Ward made a statement to us there. He said, 'I am Officer Ward, of the Homewood Police Department,' and he said, 'I just shot and killed a man.' And he pointed towards a Ford automobile, and he said, 'I shot him seven times.'

"Q Did he say anything with reference to any weapon which he might have had?

"A At this time he said, 'I guess you want this,' and he took his .45 Automatic and handed it to Officer Hanks, and Officer Hanks put it in his pocket, and we went over to the car."

The prosecution, after extensive predicatory examination under the totality test,[2] Ward told Zassoda that he had been waiting for his wife; he had parked his car so as to force "the oncoming car that came in there would have to back out to get out."

Ward pointed out the approximate place where he shot Trent. Mrs. Ward had been in the car with Trent.

Ward told Zassoda:

"He said after the Ford automobile came up into the area he heard some scream-ing coming from the car, and the door opened, and his wife came running by where his car was, and he walked up to the car."

Hanks gave the gun to Sgt. McBride.

Mr. Charles Pierce, a detective for the City of Birmingham, went to the Slayton address. There Sgt. McBride handed him a .45 automatic.

Pierce also found in Trent's car three spent hulls and a bullet which had lodged in the left front door. He gave these and the gun to Robert B. Johnson.

Johnson, a State toxicologist, without objection, testified that he fired a test bullet through the gun and under a microscope compared its striations and those of the bullet given him by Pierce. He testified that the result demonstrated that the "evidence" bullet was fired from the automatic. (R. 186.)

Pierce also found in Trent's car a pint bottle partly filled with vodka and two paper cups. One of the cups was empty, dry and did not have an odor. The other, found to the right of Trent's body, was between one-fourth and one-half full of vodka and some mixer.

The only statement which Ward gave in Pierce's hearing at the scene related to Ward's arranging for his son, Joe Ward, to take Ward's car. Later at the Birmingham City Hall in Pierce's office, Pierce told Ward "in substance," that he did not have to make a statement at that time if he didn't want to. Pierce did not mention a lawyer.

Pierce's interrogation continued as follows:

"Q What statement, if any, did Mr. Ward make to you at that time?

"A I asked Mr. Ward what his name was, and he told me, and I asked him how old he was, and he told me he was forty, and I asked him his address, and he gave me that.

---

**2.** This trial began January 11, 1965. See Mathis v. State, 280 Ala. 16, 189 So.2d 564.

"I then told him that he was charged with the murder of Mr. Harry Trent, and asked him if he wanted to make any statement in regard to this homicide, or words to that effect, and he said he didn't—that he would make a statement, and then I further told him that he realized that any statement he gave me could be used either for or against him in court, and he then said that *he would rather not make any statement until he talked to Mr. Rogers* [defense counsel].

"Q And you attempted to take no further statement from him at that time?

"A I then asked him if Mrs. Esther Ward was his wife, and he said she was, and I asked him if he had any children, and he said he did, and I made no further effort to take any statement from him." (Italics and bracketed matter added.)

Joe Ward, appellant's son, testified that, based on a number of incidents which he enumerated, his father was insane on May 14, 1964. These incidents consisted of crying spells, protesting when Mrs. Ward worked, when she got phone calls, ripping the phone cord from the wall, refusing to go to a daughter's wedding, shooting through a bed, putting a drinking glass to his stomach and falling on it, painting his boat "practically" every time after he used it, and several other episodes.

After the shooting, Ward went for three weeks into University Hospital in Birmingham. From there he went to Bryce Hospital in Tuscaloosa, staying there "close to three months." (R. 209.)

The son testified that on the night of May 14 he saw his father outside the Slayton apartment. Ward did not appear to recognize his son nor did he respond in any way to him as Joe tried to talk to him.

This witness further related he saw his father later walking toward a moving car:

"A I saw him walking towards the car, and I started screaming, telling them to back up.

"Q You started screaming, telling them to back up?

"A Yes, but the car kept coming right on.

"Q Did it hit your father?

"A He was standing right in front, by the side of the car. The car knocked him down.

"Q What happened then?

"A The car seemed like it immediately backed up.

"Q Joe, tell us, in your best judgment—can you see that from here (indicating)?

"A Yes.

"Q This little mark (indicating) indicates where the car came to rest. You know where that is, don't you?

"A Yes.

"Q Where it stopped?

"A Yes.

"Q This is your uncle's apartment, here (indicating), where the red mark is.

"Now, where, in this distance between the apartment and where the car came to rest, was it that Mr. Trent started backing the car up?

"A About the middle of the distance.

"Q About halfway?

"A Yes.

"Q About halfway?

"A Yes.

"Q All right. Did you see your father get up, or what did he do?

"A The car had backed up then, when I was still going towards the car.

"Q You were going towards the car?

"A Yes.

"Q Were you running, or walking?

"A I guess I was running.

"Q You don't know? What did you do? Did you go to the car?

"A I went to the car and got my mother out of the car.

"Q You got your mother out of the car?

"A Yes.

"Q Did you open the door, or did she open the door, or do you know?

"A I don't know.

"Q What did you do then?

"A Well, I got her out of the car and ran down the street.

"Q Did you go back the way the car had come, or how?

"A I can't say positively, but I am almost sure I went the way the car came and around to the other apartments.

"Q On the far side?

"A Yes.

"Q Did you see the shooting?

"A No.

"Q Did you hear it?

"A Yes."

Loyal Perry, who had married a sister of Mrs. Ward, testified for the defense. On the night of concern, he had seen Mrs. Ward get into a light colored Ford. He had followed the car, got the tag number, and phoned this information to Ward.

Bobbie Jean Bowman, a daughter of appellant, testified that on the day of her wedding in March, 1963, her father locked himself in his room for the day. (R. 395.) She also told some of the same incidents which her brother, Joe Ward, had related.

In the Spring of 1964, she lived in Cocoa Beach, Florida. Appellant made numerous phone calls to her:

"He would always be crying when he called, and he would always say he didn't know how much more he could take from my mother, and he always tried to get me to write to her and try to get her to do better." . .

She also testified that, from her observations, contact, and conversations with her father, he was insane on May 14, 1964.

The defense called Dr. Benjamin F. Morton, a licensed physician engaged since 1937 in the practice of psychiatry, a member of the American Psychiatric Association and other professional societies.

We excerpt from Dr. Morton's direct examination:

"A Mr. Ward, a forty year old white male was seen at my office on June 9, 1964, for neuro-psychiatry evaluations. He gave a history of being very nervous and depressed ever since May 14, 1964, when he admittedly shot and killed a man in a car who was with his wife. They had been married twenty-one years and had four children, ranging in ages from twenty-one to eight.

"His wife had left him fifteen years ago and was gone for a period of approximately three weeks, and, in the interval of the time he admitted that he had been suspicious and had followed her at times because of the feeling that she was stepping out on him. However, he could give no definite, concrete example.

"Now, he had been a police officer in the Homewood Police Department for about eight years. Prior to that he had driven a truck.

"Now, in our initial examination we felt that we were dealing with a marked mood depression.

* * * * * *

"We were suspicious of a paranoid personality because of his attitude towards his wife, but, in the absence of other information, we couldn't take a definite stand on that particular subject.

"Patient was seen again by me on June 25, 1964. His condition was unimproved, and, because of deep depression, I recommended institutionalization. I felt he could get the benefit of treatment, meaning, specifically, commitment to Bryce's Hospital. I felt he could get treatment at Bryce's and be further studied psychiatrically and, as a matter of fact, on two occasions I wrote letters recommending commitment to Bryce's Hospital.

"I was called in July, asking if it was possible for me to take him on as a patient, if I would take him on as a patient and treat his depression. And, on July 15th, 1964, he was admitted to the Psychiatry Wing of * * * University Hospital. The following morning he was begun on a course of electric shock treatment. He received the shock treatment on three successive days, and the fourth day he did not receive shock treatment.

"He was markedly improved and was smiling and laughing for the first time since he had been under my observation, and, as a matter of fact, at that time we were very pleased with the results.

"He was given another treatment following that, which was the fourth shock treatment, and that evening I was called by the nurse on the floor and was told that the patient had become emotionally disturbed and, as a matter of fact, violent, and had picked up the chair and threatened to kill the orderly on the floor. I asked her what happened, and, from her description, the orderly had merely asked him to move out of the way while he cleaned. Mr. Ward—he was in a five bedroom ward—and, for no apparent reason that they could tell he became violent and threatened to kill the orderly.

"I ordered heavy sedation and told the nurse if he had not quieted down in thirty or sixty minutes to call me back and I would come over there, and he quieted down and I did not see him again until the following morning. The following morning he was very hostile and belligerent. He had not changed in his attitude towards the orderly, and he felt that the orderly was abusive to him, and he said if he got his hands on him— meaning, 'I will take care of him,' 'I will pick up the chair and hit him over the head if I ever see him again.'

"We felt we could not manage him under those conditions, and the patient was removed from the floor, and another letter was written, making recommendation for his commitment to Bryce Hospital. He was committed to Bryce Hospital on August 4th, and it is my information he was discharged on October 12th.

*　*　*　*　*　*

"Since being out of Bryce Hospital, I saw him November 16, 1964, and again on December 14, 1964. The mood depression is definitely improved, outwardly. He shows no unusual personality manifestations. That is, the mood is within normal limitations, and we were not able to elicit any psychotic manifestation at that time, that is, * * * December 14, 1964.

"* * * Now, on the basis of the overall picture, based on my examinations and observations, my final diagnosis in the case is affective mood depression. That is the mood depression I previously referred to, and paranoid personality reaction.

*　*　*　*　*　*

"Paranoid personality reaction is an individual that exhibits certain traits, such as a tendency to be suspicious, insecure, stubborn, argumentative, at times secretive, uncompromising in his attitudes, and not tolerant of criticism. They also show a common tendency to blame others for their own inadequacies. Outwardly they show no change in their personality, and they may continue with their everyday activities without showing any apparent evidence of their underlying personality.

"They show a tendency to blame others, and this is characterized by an hostile or aggressive attitude or action to others, and they take what they consider defensive action, which is attack.

"Q Is it your opinion that Gene Ward had this paranoid personality reaction on the 14th day of May, 1964?

"A It is my opinion that he has always had it.

"Q That he has always had it?

"A Yes, sir.

"Q It is a continuing condition?

"A Yes, sir, but it hadn't been overly manifested. But, in my observation, it was definitely manifested in my examination at the hospital, after this incident in the ward.

"I may add that I was suspicious of it on the basis of his attitude towards his wife, but I did not have any benefit of any history.

\* \* \* \* \* \*

"We were impressed with the other possibility, but not having any confirmatory information from other sources we did not put that in our initial impression.

"Q At the time of your first examination of him, did you have the benefit of any history or background from any person other than the patient?

"A I talked to his brothers briefly, and the information that I could get out of them was his tendency to be suspicious of his wife, and apparently there may have been some justification for that, but I could get a great deal more information from that source.

"Q You didn't, at that time, have the benefit of any information from his wife or children or other close associates?

"A No, sir.

"Q Now, is this paranoid personality reaction sometimes difficult to diagnose?

"A Yes, sir, because, as I said earlier, frequently to outward appearance they are perfectly normal individuals, except some of these little traits that may be manifested under stress. When subjected to any undue stress, we then have an exaggeration of these traits, and he is not normal."

Mr. George Harris testified that, about three weeks before May 14, 1964, he had seen Mrs. Ward at the Jewel Box, Tutwiler Hotel. She was with a man whom she introduced to Harris as Harry Trent.

About a week later, between 6:30 and 7:30 in the morning, Harris had seen her in a light colored car driven by a man.

Bert Ward, Jr., and Lloyd Ward, brothers of appellant, testified that they had given hospital workers at Bryce's their separate recollections of Ward's unusual behavior.

The defendant did not take the stand.

When the defense rested, the State called as a rebuttal witness a stenographer of the Birmingham Police Department who had taken Joe Ward's statement the night of May 14–15.

Strictly, this testimony was used in impeachment. Young Ward, on cross, had repeatedly said that he neither recalled the questions nor the answers on that occasion with a few minor exceptions. (R. 285 et seq.)

Through the testimony of E. J. Cagle, a fellow officer with Ward on the Homewood City police force, the defense sought to show that Ward had encountered harassing domestic difficulties and was extremely nervous (or anxious) after his wife left him in the Spring of 1964.

The State, in rebuttal, called other Homewood policemen, all of whom, on cross, conceded that Ward was a quiet man.

Dr. T. H. Patton, Jr., of Bryce Hospital was called by the prosecution. Through

his testimony a question and answer interrogation of the appellant by members of the professional staff came into evidence.

Dr. Patton considered Ward schizoid with "some paranoid coloring. * * * or tendencies." On cross, Dr. Patton stated that by himself he had had two long interviews with Ward.

His opinion, in part, was elicited by the State on redirect:

"Q (BY MR. HAWKINS) Doctor, I believe your conclusion in your diagnosis was that this man was, on May 14, 1964, a sane man and had been at all times?

"A Yes, sir. He shows no evidence of a psychosis. I don't think that the act with which he is accused was based on delusions or hallucinations at all. There is no reason to think that he was not competent, and I feel that he did know what he was doing at the time. It was not based on delusions and not based on illusions."

## II.

Appellant's first claim of harmful error arises from the trial judge's refusal to let defense counsel question each member of the venire singly "as to any bias, or prejudice." Instead, the court permitted questions to be addressed to them in groups of thirteen, adding

"However, I realize that there are some questions which may be individual to a juror, because of certain peculiarities, experience, or employment, residence, and things of that sort, and, in that event, you may examine the juror individually.

"However, I will require you, generally, to examine at least in groups of thirteen."

The root of this question lies in Code 1940, T. 30, § 52:

"§ 52. In civil and criminal cases, either party shall have the right to examine

jurors as to their qualifications, interest, or bias that would affect the trial of the case, and shall have the right, under the direction of the court, to examine said jurors as to any matter that might tend to affect their verdict."

This section was written by the Code Committee as § 8662 of the 1923 Code. It seems to stem from Bowen v. State, 8 Ala. App. 103, 62 So. 1022, where we find:

"It is the better practice for the presiding judge, in examining the persons who appear in court to serve as jurors in a case that may be punished capitally, to examine them separately on their voir dire examinations touching their qualifications and competency, and not to qualify them in a body, as is shown by the bill of exceptions to have been done in this case; but at most this could only be considered as an authorized but ill-chosen expedient adopted by the court for facilitating the trial, for there is no requirement of law that the examinations shall be separately made. The action of the court in this particular, although shown to be against the objection of the defendant, would not constitute error that would require a reversal of the judgment appealed from."

See also 24A C.J.S. Crim.Law § 1900, and Anno. 73 A.L.R. 1208.

In § 52, supra, we find two "rights" of examination: (1) as to qualifications, interest or bias affecting the trial; and (2), under the court's direction, as to any matter which might affect the verdict.

■ We consider that the proviso which the trial judge added to his ruling above correctly reflected the spirit of § 52. Aaron v. State, 273 Ala. 337, 139 So.2d 309; Burns v. State, 226 Ala. 117, 145 So. 436; Gholston v. State, 221 Ala. 556, 130 So. 69; Rose v. Magro, 220 Ala. 120, 124 So. 296; Smith v. State, 36 Ala.App. 624, 61 So.2d 698 (reversed on another point 258 Ala. 86, 61 So.2d 707).

We are influenced, also, by counsel's couching his request in general terms, i. e., "as to any bias, or prejudice." A challenge too general is subject to demurrer. R. V. Hughes, 1 Car. & K. 235. Code 1940, T. 30, § 55, lists express grounds and others were known to the common law, even as to the name which a man chose for his dog.

In Dennis v. United States, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734, Mr. Justice Minton observed:

"No question of actual bias is before us. The way is open in every case to raise a contention of bias from the realm of speculation to the realm of fact. * * * "

The court there refused to decide that, as a matter of law, a statute making Federal employees eligible to serve on District of Columbia juries made them biased per se.

At the same term, a trial court's refusal of interrogation regarding the impact of Executive Order 9835 was held to have denied an impartial jury and led to reversal in Morford v. United States, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815.

We hold there was no error on this point.

### III.

### Coroner as Expert on Cause of Death

Proof of cause and effect as between Ward's several shots into the body of deceased was formally pronounced by a layman, the Coroner of Jefferson County.

Appellant argues that the cause of death of a human being is a subject which lies only within the realm of expert testimony citing Phillips v. State, 248 Ala. 510, 28 So. 2d .542, and McMurtrey v. State, 39 Ala.App. 319, 101 So.2d 88.

The argument for its factual premise goes as follows:

"Mr. Butler was shown to be the Coroner of Jefferson County since 1959. From 1951 to 1959 he had been Deputy Coroner. During that period of time he had seen many dead bodies that had wounds on them. He had also been present at many autopsies. Beyond this Mr. Butler was not shown by the Record to have any special education, training, or experience. He was not shown to have any specific experience in the examination of bodies with wounds that had caused death."

The appellant does concede that, where experiential qualifications are shown, a person who is a coroner or undertaker may be qualified to testify to the cause of a particular person's death.

Mr. Butler was a Deputy Coroner in Jefferson County from 1951 to 1959. In the latter year he ascended to his present office, and at the time of the trial had some thirteen or fourteen years of experience from this employment.

Mr. Butler testified that he had had occasion to see "many dead bodies that had wounds on the bodies"; that he had been present at many autopsies; and had testified in court on many occasions as to the cause of death of people who died as a result of some injury. He then testified that he examined the body of the deceased.

On page 87 of the record—a matter ignored by the State in brief—we find the following question, objection, ruling and answer:

"Q I will ask you, Mr. Butler, if the wounds you saw on the body of Harry S. Trent, on the night you examined his body in the Brown Service Funeral Home, was sufficient within themselves to cause his death?

"MR. ROGERS: We object to that. Calls for expert witness. Calls for medical testimony over and beyond the qualifi-

cations of this witness. It would be illegal and incompetent evidence.

"THE COURT: Overrule.

"MR. ROGERS: We except.

"A It would, sir.

"MR. HAWKINS: That's all."

An expert witness is one who is shown, either by training or experience, to be better informed than the hypothetical average juror.

One factor which is not discussed by either party in brief here is that Mr. Butler was shown by the Assistant District Attorney to have been accepted in other courts as an expert witness with reference to the cause of death of people who died as a result of injury. Considering the fact that Ward fired six or seven bullets from his pistol into the body of Trent, we do not think there was an error in allowing Mr. Butler to give his opinion as to the cause of death. Supreme Court Rule 45.

### IV.

Defense counsel contends that two policemen, Zassoda and Hanks, should have been first examined as to the proper predicate to show voluntariness before the admission of Ward's statement that he had fired seven bullets into Trent's body.

This trial occurred before June 13, 1966, but after Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, had been delivered by the Supreme Court of the United States, i. e., the trial began January 11, 1965.

The Supreme Court of Alabama has chosen to adhere to its former views of confession as shown by Mathis v. State, 280 Ala. 16, 189 So.2d 564. Moreover, the way in which this particular testimony came into evidence shows that it was a spontaneous exclamation which in our cases, is sometimes distinguishable from an inculpatory statement extracted by interrogation. See McElroy, Evidence, 2d Ed. § 200.02(3), for a full discussion of the spontaneous exclamation rule in Alabama.

Moreover, Officer Zassoda's testimony fails to show that Ward was in anywise under arrest or in custody before or while making the statement claimed not to have been established as altogether voluntary. Too, there was some evidence that Ward telephoned the Birmingham police headquarters to report that he had shot Trent.

### V.

During the cross-examination of Mr. C. L. Pierce, a detective on the Birmingham police force, the following appears in the record, pages 175–176:

"Q And you have made arrangements with the State Toxicologist, you have carried everything to him, you have done a lot of work in the preparation of this case, is that right?

"MR. HAWKINS: I object. Immaterial whether he has carried it to anybody and furnished reports to anyone. It is his duty.

"MR. ROGERS. I have a right to show what happened, Judge.

"THE COURT: Sustain."

The Assistant District Attorney's objection is well put. The State Toxicologist is not an adversary, nor is he a tame witness of the prosecution. Yet, this aspect of the enquiry was not material to the examination of the detective.

Moreover, the question has at least two, perhaps three, aspects, i. e., contact with the Toxicologist and Mr. Pierce's doing a lot of work in preparation of the case. We consider the court's ruling was correct in the circumstances.

### VI.

The State objected to certain questions put on direct examination to the defendant's witness, Mrs. Jacobs, and excluded

certain testimony of defense witness, George Harris, which related to finding Mrs. Ward with the deceased on two occasions. This information was not shown to have been communicated to the defendant.

Judge Gibson in his ruling stated as follows:

"Well, I do rule, if it wasn't communicated to this defendant it would have no bearing on the issue involved here, or as to his mental condition. I do sustain the motion on the part of the State to exclude it, and I do instruct the jury not to consider the evidence of this man's having seen or not having seen the wife of this defendant and some other party. It would have no relevancy. The law is not concerned with the truth of that situation, other than if it came to the attention of Mr. Ward and would have a bearing on his mental condition."

We consider there was no error in this, even under the wide latitude allowed because of Ward's pleading not guilty by reason of insanity.

### VII.

The State, in refuting the tendency of the defense as to Ward's claim of insanity, used a fellow member of the Homewood police force, Mr. Monroe, as a witness. On cross-examination defense counsel propounded the following hypothesis for testing Monroe's opinion as to Ward's being sane:

"Q—on the several days before the shooting, would it have made any difference, or would it have led you to form an opinion had you known that another man had taken his wife off, left with her, and that he was at home with two little children, and he had to go home in the morning, wash the children, and cook breakfast, and get them off to school, and he had to get the permission of his Chief to do that?

"Would that have helped you form an opinion?"

This question is proper for an expert witness who testifies from the basis of history and information. However, the lay witness testifying on another's sanity is required under Grissom v. State, 33 Ala.App. 23, 30 So. 2d 19, to form his opinion from observations and not from hypothetical predicates.

Cross-examination of State's witness McCormack ran into the same obstacle. There was no error in the rulings of the trial court. *Grissom*, supra. Ford v. State, 71 Ala. 385 (hn. 8 and 9).

### VIII.

The State, to rebut the effect of Dr. Morton, used Dr. Patton of the staff of Bryce Hospital, Tuscaloosa. (See Code 1940, T. 45, § 189 et seq.)

Appellant claims error in the following rulings by the trial judge:

"Q Is that the official chart (indicating) of this patient, Gene Ward, at the University Hospital?

"MR. MILLS: We object to that. I don't think Dr. Patton is the custodian of the records.

"THE COURT: Overrule. If he knows let him answer.

"A Not the University Hospital; Bryce's Hospital.

"Q Bryce's Hospital.

"A Yes, sir.

"Q And is that chart kept in the regular course of medical treatment of a patient at Bryce's Hospital?

"A Yes, sir.

"Q And is that the hospital's chart, which I have, recording the various examinations, interviews, and so on, with reference to this patient?

"A Yes.

"Q And it is a true and correct hospital chart of Bryce's Hospital, of Gene Ward, during the time of his stay in the hospital?

"MR. MILLS: We object to that, if the Court please. This witness hasn't been shown to have the necessary knowledge; not shown to be the custodian of the records there.

"THE COURT: You asked him if it is a true and correct—I don't know whether the Doctor made all the entries on there, or not.

"Q Was it kept in the regular course of the operation of the hospital?

"A Yes, it was. It is the only record we have.

"MR. ROGERS: Judge, did he withdraw his question?

"MR. HAWKINS: Yes, sir, and asked him if it was kept in the regular course of the operation of the hospital?

"THE WITNESS: Yes.

"Q Would you state to the jury—if you don't have an independent recollection, refer to the chart—the first history you received of this patient when he got to the hospital, if that was the first thing that occurred with reference to him being there.

"MR. MILLS: We object to that. I don't know whether Dr. Patton took the history. If he took it, himself, we don't have any objection to it, but, taken by someone else, it would be hearsay, and we object to it.

"THE COURT: Doctor, let me ask you this: you are on the staff there at the hospital?

"A Yes, sir.

"THE COURT: And all these various charts and records, as a member of the staff, do you have control and supervision over them?

"A I don't have supervision of them. The custodian has the supervision. All the charts at the hospital have entries made by various departments. Otherwise, we couldn't operate.

"THE COURT: Are those departments under the supervision of the staff doctors? Is the overall work supervised by the staff members, including yourself?

"A Yes, sir. I have charge of the whole west side, which is the men's division, to see that the information is obtained and placed on the chart.

"THE COURT: I will overrule the objection.

"MR. MILLS: If Your Honor please, may I question him on voir dire examination?

"THE COURT: Yes, sir.

"MR. MILLS: Doctor, you said there is a medical record librarian who has the control over the medical records at Bryce's Hospital?

"A Yes.

"MR. MILLS: And, actually, that person is the custodian of all the records there at Bryce's Hospital, I assume.

"A Yes.

"MR. MILLS: And you are not the medical record librarian?

"A Yes. (sic)

"MR. MILLS: We object to any question based on the record, Your Honor.

"THE COURT: Overrule.

"MR. MILLS: On the ground that they have not been properly identified and have not been properly authenticated, and have not been testified to by the proper custodian.

"THE COURT: Overrule.

"Q Doctor, would you state to the jury the first history which the hospital had on this patient, Gene Ward, as he entered Bryce's Hospital?

"MR. MILLS: We object unless it is a personal history taken by this doctor.

"THE COURT: Overrule."

In Metropolitan Life Ins. Co. v. Fox, 37 Ala.App. 31, 64 So.2d 122, we find:

"The records of Ochsner Clinic were introduced into evidence through Mrs. Shelby Harvey McCaffrey. Mrs. McCaffrey testified that the Ochsner Clinic makes records and memoranda in regular course of business of patients examined at the clinic. These memoranda are dictated by the doctor as soon as possible, and are typed up in the secretarial pool. Mrs. McCaffrey testified that as medical record librarian of the Ochsner Clinic she has physical custody of such records, and they have been safely kept during her employment. These records disclose that Charles James Fox was a patient in such clinic around 13 October 1944.

"We think that under the above testimony the records of Ochsner Clinic were properly received in evidence. Section 415, Title 7, Code of Alabama 1940."

This latter statute (§ 415, supra) is taken virtually verbatim from Prof. Morgan's 1927 Commonwealth Fund Committee's Report, page 63, and reads:

"§ 415. Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible in evidence in proof of said act, transaction, or event, if it was made in the regular course of any business, and it was the regular course of the business to make such memorandum or record at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term, 'business' shall include business,

profession, occupation, and calling of every kind."

See Bailey v. Tennessee Coal Iron & R. Co., 261 Ala. 526, 75 So.2d 117 (hn. 7).

From Hall v. State, 248 Ala. 33, 26 So.2d 566 (hn. 13), we quote:

"Dr. Partlow, a witness called by the defendant, was asked for the record of defendant when an inmate of the home for the feeble-minded. He had the record with him. Defendant offered to show Dr. Partlow's familiarity with the records, and that they were made in the regular course of business of the institution, and were so made under his supervision. The definition of those persons admissible to this institution is found in Sec. 236, Title 45, Code 1940, and includes idiots, imbeciles, morons and the like; and the following section makes provision for transfer of any patient therein to the authorities of the insane hospital when such patient shall become insane, violent or unmanageable.

"Considering the wide latitude allowed upon the question of insanity, we are of the opinion Dr. Partlow should have been permitted to testify as to these records. The provisions of Sec. 415, Title 7, Code 1940, were given application to hospital records in Wilson v. State, 243 Ala. 1, 8 So.2d 422, as disclosed by the tenth headnote. Under this statute, as thus construed, there was error to reverse in the rejection of the evidence sought to be elicited from Dr. Partlow."

See Nelson v. Lee, 249 Ala. 549, 32 So.2d 22 (hn. 7, 8), which sketches the background of § 415, supra; also Liberty National Life Ins. Co. v. Reid, 276 Ala. 25, 158 So.2d 667, and McElroy, Evidence (2d Ed.), § 254.01 (9).

The custodian, as a witness, would merely have authenticated the record as one contemporaneously made and kept in the regular course of the hospital's operations. Dr. Patton, though not custodian of the

records, was competent as a witness because he was familiar with Ward's examination, diagnosis and treatment as a patient at Bryce. Dr. Patton was able to fill a dual role as a witness: one from personal knowledge of Ward and his therapy and the other, from supervising the custodian of the records of the men's division. Mitchell v. City of Mobile, 244 Ala. 442, 13 So.2d 664.

In Aaron v. State, 271 Ala. 70, 122 So.2d 360 (hn. 38), the court divided 5–2 against a contention that the hospital record of the victim of Aaron's ravishment was partially inadmissible.

Lawson and Stakely, JJ., thought that, so far as the record repeated the prosecutrix's detailing of the attack, there was error because of violating the rule against allowing details of a complaint. The majority, however, found the record came in only by the defendant's consent on the issue of force, vel non.

 Here we consider it proper for Dr. Patton to have read from the hospital records rather than merely authenticate them and thus leave it in a "raw" state for the jury. He was testifying not from hearsay but on his own as an expert.

The Opinion Rule can be subserved even if the opinion is one filed in writing under the Business Records Act. McElroy, Evidence (2d Ed.), § 254.01(5).

The Business Records Act (§ 415, supra) has come not to destroy but to fulfill. It is cumulative as to any other mode of proof. Thus, Dr. Patton could both give authentication of the hospital record and, having been qualified as a psychiatrist, give his opinion quite apart from the rest of the hospital records.

 Defense counsel in brief advance the following matter of serious concern:

"A portion of the interview [with Ward by the staff of Bryce Hospital at which Patton was present and participating] which Dr. Patton read related to an account of the alleged homicide the Defendant gave in the interview. The Defendant interposed a specific objection to the reading * * * on the ground that no predicate had been laid for the admission of a confession. (Tr. 535.) This objection was overruled."

In overruling, the trial judge gave the jury the following instruction:

"I will say this to the jury at this point: the file here—nothing that the doctor testifies has been stated to him—none of his testimony is to be considered as a confession.

"We are primarily concerned with the information that the doctor is able to furnish us, within the rules of law, which would have a bearing on the mental condition of the defendant. This material is not admitted to you in the nature of a confession.

"Overrule."

Ward went into Bryce Hospital on the basis of the request of members of his family and on a letter opinion by Dr. Morton. The Probate Judge of Jefferson County signed the authorizing papers.

The prosecution, either law officers or District Attorney, did not seek to compel Ward's examination under order of the Circuit Court. Code 1940, T. 15, § 425.

Hence, Ward's interrogative custody at Bryce Hospital, though an institution of the State of Alabama, should not be equiparated with the back-room-of-the-police-station questioning condemned in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

Unless the defense showed the accused to have been mentally unfit to plead, Ward by pleading not guilty by reason of insanity introduced a subsidiary but separate issue. By his plea the defendant, in effect, concedes arguendo the act but denies its felonious quality. When made with a plea of not guilty, a plea of not guilty by reason of in-

-sanity is a "rolled-up" plea, i. e., in confession and avoidance conditioned on the jury's first finding the defendant guilty.

Thus we distinguish State v. Hathaway, 161 Me. 255, 211 A.2d 558. See Hall v. State, 209 Ark. 180, 189 S.W.2d 917; French v. District Court, 153 Colo. 10, 384 P.2d 268; State v. Myers, 220 S.C. 309, 67 S.E.2d 506; Anno. 32 A.L.R.2d 434, 447.

We see no need to try to devise any general rule of admissibility of inculpatory disclosure necessarily made by the accused in the course of psychiatric examination. Hunt v. State, 248 Ala. 217, 27 So.2d 186, is still valid though cases such as Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, require somewhat more complicated discussion of the due process question.

### X.

Appellant's brief argues that the defendant was prejudiced in the closing argument by the deputy district attorney's alluding substantially as follows: "You have read of cop killers," and proceeded to refer to the defendant as a "killer cop."

Technically, the only request to the court made in consequence of this allusion was to move for a mistrial on the ground of the argument (R. 572).

This statement was made toward the end of the State's rebutting argument. The jury was excused for lunch at 12:15 P.M. and returned at 1:35 in the afternoon, at which time the trial judge (R. 574) proceeded to charge the jury at length.

The judge began his charge by expressly telling the jury not to consider the statement, winding up, "I strongly urge you gentlemen not to consider that, not to think of it, and to completely exclude it from your minds, as if you never heard it."

This direction came promptly enough after the statement and was emphatic

3. (1843) 10 Cl. & F. 200.

enough to constitute an effective prophylaxis of any prejudice which might have occurred from the possibility of some inference being brought in from outside of the record. The undisputed evidence was that Ward at the time of the charged offense was a policeman, "a cop."

■ We consider the trial judge's action removed any consideration of error.

### XI.

Responsibility by reason of mental incapacity is determined in Alabama neither by the narrow *M'Naghten* [3] formula nor by the latitudinarian *Durham* [4] rule of the District of Columbia.

■ In Lokos v. State, 278 Ala. 586, 179 So.2d 714 (1965), we find the court, per Lawson, J., reaffirming the 1887 formulation of Mr. Justice Somerville in Parsons v. State, 81 Ala. 577, 2 So. 854:

"As excuse for the crime, the burden was on the defendant to prove clearly to the reasonable satisfaction of the jury that he was so afflicted by disease of the brain when the offense was committed as to render him so insane that he did not know right from wrong with respect to the particular offense charged, or by reason of such mental disease he could not resist doing the wrong; and the crime must have been the product solely of such mentally diseased condition. * * *"

We have been cited no Alabama case undertaking to define the expression "disease of the brain."

In the course of the oral charge, the court gave the following direction as to the measurement of sanity and the extent of departure therefrom to avoid criminal responsibility:

"Now, gentlemen, that brings us down to the law as it applies to the plea of

4. 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.

not guilty by reason of insanity. Under our law, the question of the accountability of a person for criminal action can be triable only under a special plea of insanity interposed at the time of the arraignment of the defendant. The defense of insanity must be specially pleaded, as it is pleaded in this case, because the plea of not guilty does not put in issue the question of the irresponsibility of the accused by reason of the alleged insanity, and without this special plea the defendant could not offer evidence of his sanity, or insanity. The purpose of the statute has been said to be to separate as far as possible the two defenses, that is, not guilty and not guilty by reason of insanity, and to have the proof directed to each of the two defenses, and the verdict to respond to each of such defenses.

"Now, every man is presumed to be sane, that is, of natural and normal mental condition, and I charge you that under the laws of Alabama every person over fourteen years of age, charged with crime, is presumed to be responsible for his acts. The burden of proving that he is irresponsible is cast upon the accused, and under the law he has the burden of clearly proving to the reasonable satisfaction of the jury, from the evidence, his defense of insanity.

"Now, gentlemen, in every criminal trial where the defense of insanity is imposed, the inquiry is,

"First: was the defendant at the time of the commission of the alleged crime, as a matter of fact, afflicted with a disease of the mind, so as to be either idiotic, or otherwise insane.

"Second: if such be the case, did he know right from wrong as applied to the particular act in question? If he did not have such knowledge, he is not legally responsible.

"Third: if he did have such knowledge, he may nevertheless not be legally responsible if the two following conditions concur:

"First: if, by reason of the duress of such mental disease, he had so far lost the power to choose between the right and wrong, and to avoid doing the act in question, as that his free agency was at the time destroyed.

"Second: and if, at the time the alleged crime was so connected with such mental disease, in the relation of cause and affect [sic], as to have been the product of it solely.

"Now, an irresistible impulse generated by wicked propensities will not excuse the violation of law. Depravity is not a disease. High temper, hot blood, and passion are not such mental ailments as will excuse the commission of crime. The so-called emotional insanity is not recognized as a defense in a criminal case.

"I charge you that insanity, to be a defense to a crime, must be the result of a disease of the mind and of such a nature as to dethrone his reason—in other words, to make him crazy—to destroy his reason to such an extent that he cannot distinguish right from wrong, or if he can distinguish right from wrong, that the disease has such a compelling power over him that he is *forced* to commit a crime; that he *cannot resist the impulse* to commit this particular crime, because of the diseased condition of his mind, but it must be either one or the other; that the disease has so destroyed his mental capacity that he cannot distinguish right from wrong and does not know that he is doing wrong, or that the disease of the mind must have so destroyed his reasoning—so undermined his mental capacity that he could not resist the impulse to do the wrongful act. The law of Alabama does not recognize temporary or emotional insanity or insane jealousy. Jealousy is no defense to crime in Alabama. It must be such insanity that would destroy his reason or his mind so weakened that he cannot resist the doing

of a particular act with which he is charged. And, as I said, it must be of a fixed or prolonged nature, rather than momentary or fleeting; not temporary or effervescent in nature—sane one minute and insane another—more permanent than transient; more or less prolonged as distinguished from effervescent; it must be a disease of the mind in all cases and be of such nature as to destroy his reason; that he does not know right from wrong; or some mental hallucination, the result of the disease; this hallucination must be of such strong and compelling power that he cannot resist the impulse to commit the particular crime with which he is now charged.

"That is the question that is submitted to you for your determination. Was this defendant, at the time of the commission of the act with which he is charged, insane as I have defined insanity to you? Was he suffering from a disease of the mind that had so dethroned his reason that he could not distinguish right from wrong, or had such mental hallucination so overpowered him—had such overwhelming power over him—that he could not resist the impulse to commit this particular crime? If so, that is a defensive [defense to] crime—if either one of those conditions existed, and you are reasonably satisfied of that, he would be entitled to a verdict at your hands of not guilty by reason of insanity.

"In criminal cases, in order to absolve the party from guilt, a higher degree of insanity must be shown than would be sufficient to discharge him from the obligations of his contract. In these cases, the rule of law is understood to be this: that a man is not to be excused from responsibility, if he has capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he is then doing; a knowledge and consciousness that the act he is then doing is wrong and criminal, and will subject him to punishment. In order to be responsible, he must have sufficient

power of memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences, if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and will receive punishment, such partial insanity is not sufficient to exempt him, from responsibility for criminal acts. If, then, it is proved to the satisfaction of the jury, that the mind of the accused was in a diseased and unsound state, the question will be whether the disease existed to so a high degree, that, for the time being, it overwhelmed the reason, conscience, and judgment, and whether the prisoner, in committing the homicide, acted from an irresistible and uncontrollable impulse; if so, then the act was not the act of a voluntary agent, but the involuntary act of the body without the concurrence of a mind directing it." (Bracketed matter and italics added.)

To this the defense excepted as follows: "MR. MILLS: May it please the Court, we except to the following portion of the Court's oral charge where the Court said:

"First: 'Was the defendant at the time of the commission of the alleged crime, as a matter of fact, afflicted with a disease of the mind, so as to be either idiotic, or otherwise insane?'

"And further except to the portion of the charge where the Court said: 'Depravity is not a disease.' And we further except to the portion of the charge where the Court said: 'The so-called emotional insanity is not recognized as a defense in a criminal case.

"We further except to the portion of the charge which says: 'The law of Alabama does not recognize temporary or emotional insanity or insane jealousy.'

"And we further except to the portion of the charge where the Court said: 'And, as I said, it must be of a fixed or prolonged nature rather than momentary or fleeting, not temporary or effervescent in nature—sane one minute and insane another—more permanent than transient; more or less prolonged as distinguished from effervescent.'

"And we further except to the portion of the charge where the Court said: 'In criminal cases, in order to absolve a party from guilt, a higher degree of insanity must be shown than would be sufficient to discharge him from the obligations of his contracts.' "

Also, the following requested charges submitted in writing were given:

46. "If the jury believe from the evidence that the defendant, at the time he fired the fatal shots, was acting under duress of a mental disease which destroyed his free agency, so that his power to resist killing Harry Trent was at the time lost, and the killing was the offspring of such mental disease wholly, they should acquit the defendant."

49. "If the jury believe from the evidence, that the defendant at the time he fired the fatal shots, was acting under the duress of a dormant disease of the mental faculty which appeared only under grief, fear and excitement, and it's development resulted in the killing, having been brought about by statements, of the deceased, and the killing was the offspring of such mental disease solely, the jury should acquit the defendant."

52. "If, by a preponderance of the evidence, the jury are satisfied that, at the time of the fatal encounter, defendant was afflicted with a mental disease, and that by reason of the duress of such mental disease he had so far lost the power to choose between right and wrong (although he may have known right from wrong as applied to the killing), and the alleged killing was so connected with such mental disease in the relation of cause and effect as to have been the product of it solely, the jury should acquit the defendant."

75. "I charge you, gentlemen of the jury, that if you find from the evidence that the defendant's wife had been guilty of misconduct with the deceased, and that this misconduct had been communicated to the defendant, then you may consider this evidence in determining the sanity or insanity of the defendant at the time of the shooting."

76. "I charge you, gentlemen of the jury, that if you find from the evidence in this case that the defendant's wife had abandoned him and abandoned the children of the marriage prior to the shooting, then you may consider this evidence in determining the mental condition of the defendant at the time of the shooting."

77. "I charge you, gentlemen of the jury, that if you find from the evidence that the defendant's wife had been guilty of misconduct with the deceased, and that this misconduct had been communicated to the defendant, then you may consider this evidence in determining the mental condition of the defendant at the time of the shooting."

78. "I charge you, gentlemen of the jury, that it is not necessary for insanity to have existed for *an* [sic] definite period of time prior to the shooting in this case in order to be a defense to this prosecution, but that it is sufficient as a defense if it existed when the act occurred."

The trial court refused to give the following relevant charges which the defendant requested before the case went to the jury:

47. "If the jury believe from the evidence that the defendant, at the time he fired the fatal shots, was acting under duress of a mental illness which destroyed

his free agency, so that his power to resist killing Harry Trent was at the time lost, and the killing was the offspring of such mental illness wholly, they should acquit the defendant."

48. "If the jury believe from the evidence that the defendant, at the time he fired the fatal shots, was acting under duress of a mental derangement which destroyed his free agency, so that his power to resist killing Harry Trent was at the time lost, and the killing was the offspring of such mental derangement wholly, they should acquit the defendant."

50. "If the jury believe from the evidence, that the defendant at the time he fired the fatal shots, was acting under the duress of a dormant illness of the mental faculty which appeared only under grief, fear and excitement, and it's [sic] development resulted in the killing, having been brought about by statements, of the deceased, and the killing was the offspring of such mental illness solely, the jury should acquit the defendant."

51. "If the jury believe from the evidence, that the defendant at the time he fired the fatal shots, was acting under the duress of a dormant derangement of the mental faculty which appeared only under grief, fear and excitement, and it's [sic] development resulted in the killing, having been brought about by statements, of the deceased, and the killing was the offspring of such mental derangement solely, the jury should acquit the defendant."

53. "If, by a preponderance of the evidence, the jury are satisfied that, at the time of the fatal encounter, defendant was afflicted with a mental illness, and that by reason of the duress of such mental illness he had so far lost the power to choose between right and wrong (although he may have known right from wrong as applied to the killing), and the alleged killing was so connected with such mental illness in the relation of

cause and effect as to have been the product of it solely, the jury should acquit the defendant."

54. "If, by a preponderance of the evidence, the jury are satisfied that, at the time of the fatal encounter, defendant was afflicted with a mental derangement, and that by reason of the duress of such mental derangement he had so far lost the power to choose between right and wrong (although he may have known right from wrong as applied to the killing), and the alleged killing was so connected with such mental derangement in the relation of cause and effect as to have been the product of it solely, the jury should acquit the defendant."

57. "I charge you, gentlemen of the jury, that if you believe from the evidence that the defendant at the time he fired the fatal shot was acting under the duress of a dormant disorder of the mental faculty which appeared only under grief, fear and excitement, and its development resulted in the killing, having been brought about by the statements and conduct of the deceased, and the killing was the offspring of such mental disorder solely, the jury should acquit the defendant."

A fairly wide range of questioning was permitted both defense and prosecution. We find no error under the *Parsons* rule in this case. We are bound to follow it. Code 1940, T. 13, § 95.

■ Analyzing the charges refused in the light of those given both in writing and in the oral charge, we conclude that the jury was adequately charged on the defense of insanity to crime under the decisions of the Supreme Court of Alabama. Indeed, parts could be considered as too favorable to the defendant.

We have carefully reviewed the entire record under Code 1940, T. 15, § 389, and consider the judgment below should be

Affirmed.

## ON REHEARING

### XII.

Appellant says we have failed to go into the claimed errors all of which came about from the trial judge's sustaining objections made by the State. The occasion was on qualifying the venire. The questions as given in brief are:

"Q Do you think it is morally wrong to take another man's wife and take her away from the home?"

"Q I would like to ask the jury if it would make any difference with them, as to their opinion, if it were developed by the evidence that this deceased was out with the defendant's wife at the time of the shooting, at 11:00 o'clock at night, or approximately thereabouts."

"Q Would you gentlemen consider a plea of insanity, interposed by the Defendant, where the facts would show that there was an occurrence which could, in a way, affect him mentally in such a way he would be unable to resist an impulse to commit some act?"

"Q If you were informed by the Court that the defendant is presumed to be innocent, and that the law presumes him to be innocent, would you give him the benefit of a doubt in that event?"

In order to afford a proper certiorari setting, we elaborate to show the entire pertinent part of the record from the transcript of evidence:

### "PROCEEDINGS

"(WHEREUPON, a jury venire was brought in, qualified, identified, and the following proceedings were had and done:)

"THE COURT: Now, gentlemen, that brings us down to the voir dire examination, both for the State and for the defense.

"Does the State have questions on voir dire?

"MR. HAWKINS: Yes, sir.

"(Thereupon, special questions were asked by Mr. Hawkins, following which the following proceedings were had and done:)

"THE COURT: Mr. Rogers?

"MR. ROGERS: Judge, at this time, I would like, respectfully, to ask the Court if it would let me question each juror individually as to any bias, or prejudice, and, I might state, in view of the fact that the defendant was a policeman at the time the offense with which he is charged was committed, I believe it would better serve justice if I could ask each juror individually.

"THE COURT: Mr. Rogers, I won't permit you to examine each juror individually. I will permit you to examine them in panels of thirteen.

"However, I realize that there are some questions which may be individual to a juror, because of certain peculiarities, experience, or employment, residence, and things of that sort, and, in that event, you may examine the juror individually.

"However, I will require you, generally, to examine at least in groups of thirteen.

"MR. ROGERS: The three panels?

"THE COURT: That is correct.

"Mr. ROGERS: May we reserve an exception to that?

"THE COURT: Yes, sir.

"(Thereupon, Mr. Rogers asked special questions of the jury venire, during which the following proceedings were had and done:)

"MR. ROGERS: I believe Mr. Hawkins asked you the question that, if you thought it was morally wrong to drink and I believe, Mr. Woods, you said you did.

"Now, I will address these twelve men with this question: Do you think it is morally wrong to take another man's wife and take her away from the home?

"MR. HAWKINS: Don't answer that. We object to that, if the Court please.

"THE COURT: I can't hear you.

"MR. HAWKINS: We object to that as being an improper question. It doesn't furnish information which would shed any light on striking a jury in this case. It is an argument which should come at the conclusion of the testimony, during the trial of the case, and not as for information at the present time or such a subject as that, that it is wrong to take a man's wife away. No evidence of that fact in this case.

"MR. ROGERS: May I say this to the Court—

"THE COURT: I don't want you to try to argue the case, and—

"MR. ROGERS: May I say this: May it please the Court, I was not arguing that. I was asking the question as to whether they thought it was morally wrong, in view of Mr. Hawkins' opening up that avenue, if they thought it was morally wrong to drink.

"I think I have just as much right as he does to go into that various aspect of it. I feel like it is my duty to get as much information about this, and that is the only way I know how to ask it.

"THE COURT: Sustain the objection.

"MR. ROGERS: Judge, may I ask another question along that line. I want to ask it, but I do want to protect the record on it, and I am not trying to impose on the Court or record, either.

"MR. HAWKINS: I would like to ask you to ask the question in the Court's chambers, if it is of such a nature as that.

"THE COURT: I think if you would confine yourself to general objections, rather than trying to tell me how to run court, Mr. Hawkins, we can get along better.

"I was going to ask you to step over here and tell me what the question is.

"(Thereupon, ensued an off the record discussion, out of the hearing of the jury, following which the following proceedings were had and done:)

"THE COURT: What was the question, George?

"MR. ROGERS: I would like to ask the jury if it would make any difference with them, as to their opinion, if it were to be developed by the evidence that this deceased was out with the defendant's wife at the time of the shooting, at 11:00 o'clock at night, or approximately thereabouts.

"THE COURT: And I sustain the objection to that question.

"MR. ROGERS: And I reserve an exception.

"(Thereupon, Mr. Rogers continued asking special questions of the jury venire, during which the following proceedings were had and done:)

"MR. ROGERS: Gentlemen, for your information, there is a plea of insanity interposed in this case by this defendant.

"I would like to ask any of you gentlemen if you have any fixed opinion, with respect to a plea of insanity on the part of a defendant charged with an offense, that would prejudice the rights of this defendant in any way?

"If you have such an opinion—I am addressing myself to the twelve in the box. If you have such an opinion, would you please let me know it.

"Would you gentlemen consider a plea of insanity, interposed by the defendant, where the facts would show that there was an occurrence which could, in a way, affect him mentally in such a way he

would be unable to resist an impulse to commit some act?

"MR. HAWKINS: Your Honor, if the Court please, I think the question of insanity as depicted here, as an irresistible impulse, wouldn't be a matter of materiality and information.

"THE COURT: Sustain the objection. I might state this to you gentlemen at this time: It will be a rule—it is a rule that jurors may not be questioned concerning anticipated instructions or theories of law, and jurors may not be asked what kind of verdict they might render under any circumstances.

"That will be the ruling. It is the ruling of the Court, and it might help expedite matters if I state that at this time.

"MR. ROGERS: I understand that, but I didn't think my words would bias or prejudice on the jury.

"THE COURT: I sustain the objection.

"MR. ROGERS: Reserve an exception.

"(Thereupon, Mr. Rogers continued asking special questions of the jury venire, during which the following proceedings were had and done:)

"MR. ROGERS: Gentlemen, I am going to address this to—in order to expedite matters—to the venire out here. That means all thirty-nine of you, the three panels.

"If you were informed by the Court that the defendant is presumed to be innocent, and that the law presumes him to be innocent, would you give him the benefit of a doubt in that event?

"MR. HAWKINS: I object to the question on the ground it is a question of law. It is seeking information on a question of law, which the Court will give to the jury at the conclusion of the trial.

"THE COURT: I sustain the objection.

"MR. ROGERS: Reserve an exception.

"(Thereupon, Mr. Rogers continued and concluded asking special questions of the jury venire, following which the following proceedings were had and done:)

"MR. ROGERS: I believe that's all right now, Judge.

"(Thereupon, proceedings were in abeyance, following which special questions were asked by Mr. Gwin, following which the following proceedings were had and done:)

"THE COURT: All right, gentlemen, you may proceed to strike."

We cannot here assume that the last quotation contains all the voir dire questions put to the prospective jurors. Thus we note that Mr. Rogers (R. 66) complained that the Deputy District Attorney, Mr. Hawkins, had asked if they thought it was morally wrong to drink. No prior reference is made as to what questions Mr. Hawkins posed.

There is confusion in the Alabama opinions as to the latitude of voir dire examination. In 1923 the Code Committee, to modify the English rule (see Anno. 99 A.L.R.2d 7, 16, § 2(a)) as shown in Bales v. State, 63 Ala. 30, enacted what is T. 30, § 52, of the present Code.

We find Brickell, C. J., saying in *Bales*, 63 Ala. at p. 38:

"The proposed examination of Smith, Tucker and Strange, to ascertain whether they were subject to challenge for cause, after they had been examined by the court, was properly refused. We know of no authority, and we perceive no reason for any such speculative, inquisitorial practice, consuming needlessly the time of the court, and offensive to the persons subjected to it. The rule is ancient, that neither party has a right to interrogate a juror before he is challenged.—1 Chitty's Cr.Law, 543–44; King v. Edmonds, 4 Barn. & Ald. 671."

As late as 1908, we find this rubric relied on by Denson, J., in Walker v. State, 153 Ala. 31, 45 So. 640:

"After a juror has been sworn and examined by the court touching his qualifications for service, and declared competent, the court may as matter of grace allow the defendant to ask him additional questions; but it is not a matter of right, and the refusal by the court to allow additional questions will not constitute error. * * * "

Perhaps Tyson, J., in Jarvis v. State, 138 Ala. 17, 34 So. 1025, stated the principle extant before 1923 more forcefully:

"While it is doubtless true that the rule prevailing in this state is that, before challenge, neither party has *a right* to interrogate a juror to ascertain whether he is subject to challenge (Bales v. State, 63 Ala. 30; Hawes v. State, 88 Ala. 37, 66, 2 So. 302; Lundy v. State, 91 Ala. 100, 9 So. 189; Hornsby v. State, 94 Ala. 55, 10 So. 522), yet, the court, in the exercise of its discretion, may permit it to be done and, when allowed, is not revisable. Mann v. State, 134 Ala. 1, 32 So. 704; State v. Lautenschlager, 22 Minn. 514; 1 Thompson on Trials, § 101, p. 100. The action of the court in allowing the solicitor to interrogate jurors Rabby and Mc-Millan as to their relation, either by blood or by marriage, with the defendant, and in permitting the solicitor to ask Juror Curtis Bush, 'Are you opposed to capital punishment in a case of murder?' is not revisable. * * * "

■ Carefully analyzing the operation of § 52, supra, as construed by cases such as New York Times v. Sullivan, 273 Ala. 656, 144 So.2d 25, and Aaron v. State, 273 Ala. 337, 139 So.2d 309, we consider that our Supreme Court has avulsed the mandatory "shall have the *right*" twice used in § 52 into a mere precatory adjuration to the humane instincts of the trial judge. The question of the voir dire examination of would be jurors allowed or disallowed below is not subject to review on appeal. Rose v. Magro, 220 Ala. 120, 124 So. 296 (hn. 10). (Italics added.)

Being conformed by the majority opinion in Ballard v. State, 236 Ala. 541, 184 So. 260, we forego considering the due process implications of this conclusion. Code 1940, T. 13, § 95; Redus v. State, 243 Ala. 320, 9 So.2d 914.

■ Moreover, the use of hypothetical questions is of doubtful propriety certainly where one aspect of the putative evidence is singled out to probe for a sympathetic commitment as much as to explore for an impartial mind. Thus the summary to the Annotation, "Propriety and Effect of Asking Prospective Jurors Hypothetical Questions, on Voir Dire, as to how they Would Decide Issues of Case," 99 A.L.R.2d 7, at page 18, states:

"For a wide variety of reasons, however, certain hypothetical questions have often been considered improper. Some questions have been so considered because of their underlying purpose, and others because of their form. Although occasional decisions indicate disapproval of all hypothetical questions to jurors, it is generally agreed that the mere fact that a question is hypothetical does not make it improper. The main reasons for considering certain hypothetical questions improper appear to be essentially as follows: (1) they tend to entrap, influence, commit, or obtain a pledge from jurors, or to ask them for their decision in advance of their hearing any testimony; (2) they are irrelevant, because they cannot be expected to result in an answer having any bearing upon a juror's impartiality or other qualifications, or because they are designed to ask about matters of law or other matters which are adequately covered by the judge's instructions, and which it is therefore unnecessary to ask the jurors about on voir dire, since it can be assumed that they will follow the instructions; or (3) they are faulty in form, for example, because they are ambiguous, obscure, confusing, or inconsistent, or because they contain an incorrect or inadequate statement of law."

### XIII.

It is contended that the Deputy District Attorney, in closing argument, breached the command of Code 1940, T. 15, § 305, which reads:

"§ 305. On the trial of all indictments, complaints, or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness; and his failure to make such request shall not create any presumption against him, nor be the subject of comment by counsel."

The record fails to give the verbatim text of the prosecutor's remarks. All we find in the record is:

"THE COURT: * * * As I understand it, the argument that the defense objected to was an argument wherein Mr. Gwin stated, in effect, that the defendant, as an officer, had arrested many, and that sort of thing, speaking of duties of a Police Officer, and he had testified in many cases.

"MR. MILLS: I believe I wrote it down almost verbatim. He said this man has testified in Court on many occasions in many cases.

"THE COURT: To put it in context,—

"MR. MILLS: He had previously stated he had made many arrests.

"THE COURT: He started off by saying he had been a policeman some eight years, and he went into the question of arrests, and had been a witness in many cases, and—

"MR. MILLS: And testified on many occasions.

"THE COURT: The Court overrules the objection. The defendant had objected and the grounds to that portion of the State's argument, on their objection, was, in the defendant's words, that there was reference to the fact that, either directly or indirectly the defendant hadn't taken the witness stand." (R. 573, 574.)

▮ This line of argument could be directed to Ward's sanity as much as to his not taking the stand. We find no error in either the overruling shown above or in denying the defense motion for mistrial.

### XIV.

In view of the giving of defendant's charge 44 and the tenor of the pertinent part of the oral charge, the refusal of requested charge 45 was not error.

### XV.

In Carr v. State, Ala.App., 198 So.2d 791 [5] (6 Div. 157), we reviewed the "irresistible impulse" modification of *M'Naghten* as recognized in Alabama. In Report of the Royal Commission on Capital Punishment, September, 1953, Cmd. 8932, Appendix 9B, at p. 410, the *Parsons* opinion is described as "the leading judicial exposition of the irresistible impulse doctrine."

This commentary notes that only one other American state has followed Alabama in requiring the defense to prove that uncontrollable impulse was the *sole* cause of the act. This point, too, was before us in *Carr*, supra.

In requested charges 46, 49, and 52, the defendant used "wholly" or "solely" to modify the product of mental disease. However, in certain parts of the oral charge (see quotation, supra) the trial judge omitted "solely" in stating the rule of excusing mental disease.

Either the Legislature or the Supreme Court of Alabama is the proper forum for any radical departure from the *Parsons* rule. The welter of confusing psychiatric opinion ranging from Szaz to Overholser and Cleckley justifies caution.

We consider the application for rehearing must be

Overruled.

5. 43 Ala.App. 642.